IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

WILLIAM T. WULIGER, , Receiver,

                        Plaintiff,                        Case No. 3:03 CV 7457

       -vs-

                                                MEMORANDUM   OPINION

MANUFACTURERS LIFE
INSURANCE COMPANY,

                        Defendant.

KATZ, J.

This matter is before the Court on the parties' cross-motions for summary judgment, opposition and attendant replies thereto.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332.  For the reasons that follow, Plaintiff's motion is well taken and the Defendant's motion is denied.

**BACKGROUND**

This case is one of many related to a universe of litigation created by a viatical insurance debacle initiated in *Liberte v. Capwill*, Case. No. 5:99 CV 818 (N.D. Ohio).[1]  In that case Liberte Capital Group ("Liberte") and Alpha Capital Group ("Alpha") charged that James A. Capwill ("Capwill"), through the entities Viatical Escrow Services, LLC ("VES") and Capital Fund Leasing ("CFL"), unlawfully diverted investor funds escrowed for insurance premiums or awaiting placement in viatical contracts.    The Court-appointed General Receiver, Victor M. Javitch[2] ("Javitch"), initiated suits against agents, brokers, brokerage houses, banks and various

---

[1]
 For a case history, *see Liberte v. Capwill*, 229 F.Supp.2d 799, 800-801 (N.D. Ohio 2002).

[2]
                                    (continued...)

insurers all with an eye towards marshalling assets on behalf of the investors, the ultimate victims in this debacle.

In the above-captioned action, the Plaintiff seeks a declaratory judgment and rescission of three life insurance policies[3] issued by Defendant Manufacturers Life Insurance Company (USA) ("Manufacturers"). The Plaintiff requests the policies be declared void *ab initio* and demands return of premiums paid including interest thereon. Manufacturers moves for summary judgment on the basis that: (1) the Receiver is without standing to assert the claims; (2) the Receiver may not raise the issue of a lack of insurable interest; (3) the policies were not void; and (4) the doctrine of unclean hands precludes equitable relief. In contrast, the Plaintiff seeks summary judgment asserting (1) that the policies were void *ab initio*; (2) that a lack of insurable interest may be raised as a defense to the formation of a valid contract of insurance; (3) that the Receiver is empowered to bring this action; and (4) that the doctrine of unclean hands does not, in this circumstance, preclude equitable relief.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[2](...continued)
 Initially Frederick M. Luper was appointed Receiver on July 15, 1999; however, effective July 26, 2000, Javitch replaced Luper in that capacity. On August 3, 2004, pursuant to a Court order, the duties of the General Receiver were modified, transferred and assumed by the Alpha Receiver, William T. Wuliger. (*Liberte*, Doc. No. 2243.)

[3]
 Policy No. 5865984 issued to Harry Brooks; Policy No. 58429531 issued to Febus Grunberg; and Policy No. 58142993 issued to Alfred Leibert.

of law." FED. R. CIV. P. 56(c).  The moving party bears the initial responsibility of "informing the

district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  The movant

may meet this burden by demonstrating the absence of evidence supporting one or more essential

elements of the non-movant's claim.  *Id.* at 323-25.  Once the movant meets this burden, the

opposing party "must set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202

(1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment

cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply

[to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some

type of evidentiary material in support of its position.  *Celotex*, 477 U.S. at 324, 106 S. Ct. at

2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary

judgment must be entered "against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial."  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw

all reasonable inferences therefrom in a light most favorable to the nonmoving party."  *Williams*

*v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### DISCUSSION AND ANALYSIS

A.  *Standing of the Receiver*

      1.  Applicable Standard

The party invoking federal jurisdiction has the burden of establishing the elements of standing.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561-562 (1992).  The nature of the standing doctrine encompasses both constitutional and prudential requirements.  Failure to establish standing is a jurisdictional defect.  *Stupak-Thrall v. Glickman,* 346 F.3d 579 (6th Cir. 2003).  Moreover, standing is determined as of the date the suit is filed.  *Senter v. General Motors Corp.,* 532 F.2d 511, 518 (6th Cir.) *cert. denied*, 429 U.S. 870 (1976).

With regard to the constitutional aspects, in order to meet this burden the plaintiff must

establish the requirements set forth to satisfy Article III standing requirements, which require a

plaintiff to show:

> "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Cleveland Branch, N.A.A.C.P. v. City of Parma, Oh.,* 263 F.3d 513, 523-524 (6th Cir. 2001), *cert.*

*denied,* 535 U.S. 971 (2002) (citations omitted).

The prudential standing considerations require the court to consider: (1) whether the

alleged injury to plaintiff falls within the "zone of interests" protected by the statute or

constitutional provision at issue; (2) whether the complaint raises nothing more than abstract

questions amounting to generalized grievances that are more appropriately resolved by the

legislative and executive branches; and (3) whether the plaintiff is asserting its own legal rights

and interests rather than those of a third party.  *See In re Cannon III,* 277 F.3d 838, 853 (6th Cir.

2002).  With this framework in mind, the Court now turns to the parties contentions.

2. Receiver History

Before delving into the legal analysis as to standing, the Court deems it necessary to

outline the history of the Receivership and its odyssey to this juncture.  The *Liberte* case was

initiated in early April 1999.  On July 2, 1999, the Court approved the appointment of a receiver

based upon the following conclusions of law:

> 1. There is an imminent danger that the funds managed by Capital [Fund Leasing ("CFL")] for the benefit of the investors, Liberte and Alpha will be lost, concealed, or diminished in value to the detriment of the plaintiff, the intervening plaintiff and the investors in viatical contracts.

5

2.  The investors, Alpha and Liberte have no adequate remedy at law.

3.  The denial of the appointment of a Receiver has the probability of causing Liberte and Alpha more harm than the appointment of a Receiver will cause the Capwill interests who oppose the appointment of a Receiver.

4.  There exists the probability of success on the part of Liberte and Alpha in this action along with the strong probability of irreparable harm if the appointment of a Receiver is denied.

5.  The interests of Liberte and Alpha will be served by the appointment of a Receiver.

*Liberte,* Doc. 121, p. 15.

The judgment entry appointing the Receiver states in pertinent part:

that it is beneficial for a Receiver to be forthwith appointed as requested by Intervenors to take charge of the assets belonging to VES and CFL, to manage those assets and to see to the proper administration and, where appropriate, eventual sale of said assets and distribution to creditors in order to the legal priorities and that, in the interim, litigation among the parties to this action be stayed except upon conditions that may be set by the Court.

*Id.* Doc. No. 132.  The entry further states the Receiver is "to take charge of the property of

Defendants Viatical Escrow Services, LLC ("VES") and Capital Fund Leasing ("CFL")" with the

overall goal of the receivership as "preserv[ing], and increas[ing] the estate for the benefit of all

the creditors, investors, owners and parties to this case."  *Id.*   While the entry of appointment

states that the Receivership is to "oversee and to administer the business and assets of VES and

CFL," those actions were delineated in part as follows:

(b) if advisable, to obtain an appraisal of some or all of the assets of VES and CFL:
(c) to sell the assets of VES and CFL, including real property, on terms, provisions and conditions as shall be prescribed pursuant to further order of the Court;

(d) to satisfy the claims of creditors, including investors and other parties, in order of legal priority;

> (e) to perform an accounting of VES and CFL property, including the making of recommendations to the Court regarding findings of fact and conclusions of law on claims among the parties with respect to VES and CFL.
>
> . . .
>
> (h) upon application and approval by the Court, to *institute, prosecute*, defend, intervene in, become party to, compromise or settle all such cases and proceedings as are in the Receiver's property or to carry out the terms of this Order, whether such cases and proceedings are now pending or hereafter brought by or against the Receiver in his capacity as Receiver of VES and/or CFL, against VES, or against CFL in state or federal courts or administrative agencies or other forums.

*Id.* at pp. 2-3.  (Emphasis added.)

In November 1999, upon motion by the Receiver and with the consent of Capwill, the

Court ordered the following:

> The scope of the Receivership is hereby extended to cover all interests in any and all insurance policies funded by investors which Liberte Capital, LLC or Alpha Capital, LLC contacted, which are or were in the name of James A. Capwill, Capwill & Co., CWN Group or any other name, either as nominee owner or as trustees (or any other capacity) (the "Subject Policies"), for the purpose of managing and administering insurance policies in which one of the foregoing either is named as owner, beneficiary or Trustee, including, but is not limited to death claims, rescission issues, premium payment issues and anything else reasonably necessary in the management of these insurance policies. . . The scope of the receiver ship is further extended to cover any and all interests in any bank accounts or brokerage accounts which are or were in the name of James A. Capwill, Capwill & Co., CWN Group, or any other name into which the estate funds went, except the accounts listed in A and B.

(*Liberte*, Doc. No. 272, p.3 at ¶ 1.)

As the case against Capwill (in *Liberte*) was evolving, the federal government filed a

forfeiture action against J. Richard Jamieson, Liberte Capital Group, LLC and related entities.

*United States v. Jamieson,* 3:00 CV 7312 (N.D. Ohio).  In the *Jamieson* action, the government

sought and obtained an injunction enjoining the *Jamieson* defendants from defrauding insurance

companies as well as the investors. On October 17, 2000, Victor M. Javitch, Receiver, was

directed to administer the sales of non-fraudulent Liberte policies, *thereby expanding the scope of*

7

*the estate to cover the interests in those policies funded by the Liberte investors.  Liberte*, Doc. No. 777.

With that history in mind, the Court now turns to the parties' contentions.

3.  Discussion

Federal equity receivers are appointed to take control, custody, and/or management of property involved in litigation.  It is generally recognized that a receiver may bring suit to "accomplish the objective of the suit for which he or her appointment was made, or under the specific directions of the appointing court, or pursuant to his general duties to receive, control, and manage the receivership property."  12 Wright, Miller & Marcus, Federal Practice & Procedure § 2984 (2d ed. 1997).  *See also,* 65 Am. Jur.2d Receivers § 129 (2d ed) (powers of a receiver flow from statute, court rules, orders of appointment and subsequent orders of appointing court).

In the *Liberte* case, the VES, CFL and Alpha entities are all defunct.  Additionally, both receivers operate under the Court's directive, which is generally aimed at marshaling assets for the benefit of the class/investors[4], among others.  The evolving nature of the *Liberte* action is evident from the orders regarding the Receiver's responsibilities following his initial appointment.  For example, in October 2000, the Receiver was authorized by the Court to "take control over and to be provided with authority to dispose of and protect said policies in the best interests of investors."  *Liberte*, Doc. No. 777.  Approximately three months later, in a settlement agreement entered into between Capwill, Liberte and Alpha (an intervening plaintiff), it was agreed that, "Victor Javitch will remain in place as the Receiver and *he will continue to act on behalf of the plaintiffs, intervening plaintiff, and their investors for purposes of obtaining recovery of money and assets*

---

[4]

The Liberte investors were certified a class as of March 2001.  *Liberte*, Doc. Nos. 991 and 992.

8

and to take direction of the U.S. District Courts in Akron and Toledo to enhance the economic

interests of the plaintiffs, intervening plaintiffs as well as their investors with the goal of

protecting the economic interests of same." *Liberte*, Doc. No. 925.  (Emphasis added.)

Considering the expanding scope of the receivership estate and attendant responsibilities,

the grant of authority vested in the General Receiver is broad and encompasses the interests of the

entities, Liberte, VES, CFL which includes the present insurance policies.   To the extent that the

Receiver represents the interests of Liberte and seeks to recover those premiums on its behalf, the

Plaintiff has alleged an injury in fact.  Since Liberte acquired the policies, established and placed

them in trust accounts, and paid the premiums thereon, Liberte has sustained a distinct and

palpable injury.  *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206 (1974) ("plaintiff

still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large

class of other possible litigants").  In addition, the purchase and sale agreement lists the insured as

the seller and Liberte as the purchaser.  *See* Doc. Nos. 42, Ex. B; 44, Ex. 14; 45, Ex.7.  The viators

assigned their policies to an irrevocable trust naming Capwill & Co. as the trustee.  It is

undisputed that Liberte paid the premiums.  Therefore, the premiums at issue are a recoverable

injury by  the Receiver, as a representative of Liberte and the Capwill entities.

Next, turning to whether a causal connection exists between the injury and conduct

complained of, the complaint alleges the Defendant is not lawfully entitled to the premium

payments as the policies were secured through fraudulent representations and that those premiums

were paid with investor monies.  Defendants contend Liberte's participation in the "loss" was

created as a result of its own conduct and since investor funds were applied after issuance of the

policy, a causal connection is lacking herein.   This Court disagrees because although Defendants

9

issued what it thought were valid life insurance policies,  the Defendants' conduct which

prompted this suit was the refusal of the insurer to refund the policy premiums upon the request of

the Receiver.  Stated differently, the harm to the Receivership entities was the failure to return

premiums on an allegedly void policy.  It is this connection, the failure to refund policy premiums

to the funding party, which satisfies the causal connection.

Finally, as the Receivership is the proper party to assert this cause of action, rather than the

investors[5], the injury, the return of premiums, is not speculative and would likely be redressed by a

favorable decision.

On this basis, the Court finds the Receiver has standing to assert the stated causes of action

herein on behalf of the Receivership entities.

*B.  Doctrine of Unclean Hands*

The doctrine of unclean hands has been characterized as follows:

> It means that equity refuses to lend its aid in any manner to one seeking its active
> imposition, who has been guilty of unlawful or inequitable conduct in the manner
> with relation to which he seeks relief.

*McClanahan v. McClanahan*, 79 Ohio App.3d 231, 234, 72 N.E.2d 798, 800 (1946) (citation

omitted).  Therefore, a party may not profit by their fraud and  a court considering relief by the

offending party may deny it under this doctrine.  The Defendant contends the Plaintiff cannot

prevail as Liberte, the party which was complicit in perpetrating this fraud, is a party to this

proceeding albeit through the Receiver.

---

5

  The Sixth Circuit recently held the Receiver lacked standing to represent investors on tortious
conduct claims.  *Liberte Capital Group v. Capwill*, 2007 WL 2733335 (6th Cir. 2007).  The Court
does not address the issue of standing of the investors based upon the Circuit's ruling which
negates discussion of that issue.

While the Defendants assert the defense of unclean hands, this defense must fail for two reasons.

First, an exception to the general rule occurs where the questioned conduct of the plaintiff affects third persons, not the defendant, and where application would result in unjust enrichment of the party asserting the defense. *Id.*   In this instance, Liberte, through its principal, J. Richard Jamieson, was responsible for the pursuit of these policies.  Jamieson's ability to control Liberte ceased in mid-2000 and as noted previously, the Receivership was authorized to represent the interests of the entities for the purpose of marshalling funds for the defrauded investors.  Jamieson was ultimately convicted of multiple money-laundering crimes and the Receivership was authorized to sell the non-fraudulent policies.  It is the Receivership, representing the defunct entities, which is seeking this declaratory judgment for the benefit of its creditors.  The failure of the Defendants to return those premiums would not  impact Liberte or Jamieson but Liberte's creditors,  and would allow a windfall to the Defendant.

Second, although the Receiver stands in the shoes of Liberte, the removal of Jamieson and other principals involved in the wrongdoing removes the imputation of misconduct to the Receiver.  In an analogous defense, that of *in pari delicto*, the removal of the malfeasant was key. For example, in *Scholes v. Lehman,* 56 F.3d 750, 754-755 (7th Cir.), *cert. denied sub. nom, African Enterprise Inc. v. Scholes*, 516 U.S. 1029 (1995), Judge Posner provided this explanation:

> Though injured by the [corporate agent] Douglas, the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud. . . But the reason, of course, . . . is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors.  That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations.  The appointment of the receiver removed the wrongdoer from the

11

scene.  The corporations were no more Douglas's evil zombies.  Freed from his spell they became entitled to the return of the moneys--for the benefit not of Douglas but of innocent [creditors]--that Douglas had made the corporations divert to unauthorized purposes.  That the return would benefit the [creditors] is just to say that anything that helps a corporation helps those who have claims against its assets.  The important thing is that the [creditors] were not complicit in Douglas's fraud; they were its victims.

Put differently, the defense of *in Pari Delicto* loses its sting when the person who is *in Pari Delicto* is eliminated.  Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their . . . creditors, we cannot see an objections to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas.

*See also, McCandless v. Furland,* 296 U.S. 140, 56 S.Ct. 304, 80 L.Ed. 473 (1935) (participation by debtor's management or agents in wrongful conduct does not bar a receiver's action under the doctrine of *in parti delicto*).

Even in the context of a bankruptcy dispute, the imputation of wrongdoing to an innocent successor estate does not comport with the equitable doctrine of *in pari delicto*:

A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the [debtor]; it is thrust into those shoes.  It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the [debtor]'s assets to cure any associated defects. . . In light of these considerations we conclude that the equities between a party asserting an equitable defense and a [debtor] are at such variance with the equities between a party and a receiver of the [debtor] that equitable defenses good against the [debtor] should not be available against the receiver.  To hold otherwise would be to elevate form over substance--something courts sitting in equity traditionally will not do. . . [T]he [debtor']s inequitable conduct is not imputed to [a receiver].

*F.D.I.C. v. O'Melveny & Myers,* 61 F.3d 17, 19 (9th Cir. 1995).  *See also Official Committee of Unsecured Creditors v. R.F. Laferty & Co.,* 267 F.3d 340, 358 (3d Cir. 2001).

As the Receiver in this instance seeks relief to the benefit of the creditors, to allow the Defendant to profit at the expense of third parties would be contrary to the notions of equity.  For these reasons, the Defendant's arguments on this defense is not well taken.

12

*C. Insurable Interest*

The Defendant next contends only the insurer may raise the issue of an insurable interest.

The concept of an insurable interest is to be considered when there is a *valid* policy at issue. *See* 3

Couch on Insurance § 41:1 (3d ed. 2005) ("it is universally held, either by force of statute or upon

public policy grounds that insurable interest is necessary to the validity of a policy, no matter what

the subject matter"). Likewise, an insurable interested is defined as, "a real and substantial

interest in specific property as will prevent a contract to indemnify the person interested against its

loss from being a mere wager policy." Black's Law Dictionary 802 (6ᵗʰ ed. 1990). *See also Union*

*Central Life Ins. Co. v. Harp*, 208 La. 806, 824, 14 So.2d 643, 649 (1943) (lack of an insurable

interest is a genuine issue where validity of the contract is concerned).

In this instance, the Plaintiff does not seek the collection of insurance proceeds but

challenges the validity of the policies. Therefore, the issue of who can assert an insurable interest

is of little consequence if the policy is deemed void. Accordingly, the Defendant's arguments on

this issue are without merit.

*D. Whether Policies are Void Ab Initio*

Plaintiff seeks to have these policies declared *void ab initio* on the basis that they were

wagering contracts which are contrary to public policy. The Defendant argues that the policies

were valid as they were taken out by the viators who had valid insurable interests in their own

lives. What complicates this generally valid legal assertion is that the viators in this case were

predisposed to assign their policies in return for a fee.

It is generally accepted that everyone has an insurable interest in their own life. Both

Florida and Ohio[6] hold that where an insured does not have an insurable interest in the property or

the risk insured the transaction constitutes a wager contract and is invalid as it is against public

policy. *Knott v. State ex rel. Guarany Income Life Ins. Co.*, 136 Fla. 184, 186 So. 788 (1939);

*Westfall v. American States Ins. Co.*, 43 Ohio App.2d 176, 334 N.E.2d 523 (1974). The issue of a

wager policy was addressed by the United States Supreme Court as follows:

> It is not easy to define with precision what will in all cases constitute an insurable interest, so as to take the contract out of a class of wager policies. It may be stated generally, however, to be of such an interest, arising from the relations of the party obtaining the insurance, either as creditor of or surety for the assured, or from the ties of blood or marriage to him, as will justify a reasonable expectation of advantage or benefit from the continuance of life. . .
> But in all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured. Otherwise the contract is a mere wager, by which the party taking the policy is directly interested in the early death the assured. Such policies have a tendency to create a desire for the event. They are, therefore, independently of any statute on the subject, condemned, as being against public policy.

*Warnock v. Davis,* 104 U.S. 775, 779, 26 L.Ed. 924 (1881).

The test for whether such a contract falls within the ambit of a wagering contract was

addressed by the Eighth Circuit in *Bankers' Reserve Life Co. v. Matthews*, 39 F.2d 528, 529 (8th

Cir. 1930), "The crux is whether the policy was a wagering contract at the time it became effective

as a contract. If, at the time, such assignment was contemplated by the insured, it is a wagering

contract, otherwise, it is not."   That was the exact issue before the appellate court in *Bankers'*

and the Eighth Circuit upheld the jury's verdict on that factual dispute.

---

6

  As noted by the Defendants, the Receiver, who resides in this forum, brought the action in Ohio
and the viators live in Florida. As there is little difference between Ohio an Florida on the
determinative issues, either case law is applicable.

The authorities on this subject make clear that a contract made contrary to public policy is deemed invalid. *See* Willison on Contracts § 17:5 (4ᵗʰ ed. 2007) ("in the absence of a prohibitory statute, a person may take out a policy on his own life, pay the premiums, and designate as a beneficiary any person he chooses, even though the beneficiary chosen would otherwise have no insurable interest in the life of the insured.  Such a policy is not a wagering contract, unless the transaction is for the purpose of speculation and is mere cover for a wagering transaction."); 30A Fla. Jur 2d Insurance § 1501 (2007) ("While there are generally no restrictions on the right of a person to insure himself or herself against all losses from any peril not occasioned by his or her own personal fraud, contracts which under the guise of insurance are actually nothing more than wagers are illegal.")

In this case, the insurer does not dispute that the viators undertook secure policies in their name with the intent of assigning them for a fee.  Both sides agree that the insurer "had no knowledge of the fraudulent scheme or the true intention of the viators in obtaining the life policies from Manulife USA."  If the undisputed facts are supported by the Plaintiff via the depositions and affidavit, then it was the intent of the viators to obtain policies for a fee.   This is an example of a wagering contract as it is "but a speculative interest in the death of another, without any interest in his life to counterbalance it." *Aetna Life Insurance Co. v. France*, 94 U.S. 561, 565 (1876).  The wagering aspect was assumed by Liberte for the purpose of marketing these policies to investors.  The viators were seeking an immediate financial benefit for themselves.  It is difficult to characterize this type of transaction as anything less than a wagering contract.   Both Ohio and Florida have deemed wagering contracts as void for public policy.  *Knott, supra*; *Westfall, supra. See also* 57 O Jur 3d § 436 (2005) ("A wager policy has been defined as an

15

insurance policy in name and form only, in which the insured has no interest whatever in the subject matter insured but only an interest in its loss or destruction.") In this case, the viators were merely a pass-through for the viatical broker and derived a financial benefit for their service of securing the policy. It seems difficult to imagine such a situation can fall outside the definition of a wagering contract.

As the Defendant does not dispute the facts as presented by the Plaintiff through the depositions and affidavit, the Court finds there is an absence of a genuine issue of material fact regarding the viator's predisposition to sell the policies upon procurement of the same. Each of the viators took out policies of insurance to transfer for a fee to Liberte which, in turn, marketed them to their investors. As the procurement of these policies was tantamount to wagering contracts, the Court finds that the policies at issue are void *ab initio* and subject to rescission.

*E. Unjust Enrichment*

Plaintiff seeks recovery of the premiums paid on the policies under the theory of unjust enrichment.. To establish those elements, the movant must establish: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust for him to retain that benefit without repayment. *Hambelton v. R.G. Barry Corp.*, 12 Ohio ST.3d 179, 183, 465 N.E.2d 1298 (1984).

Here, following the assignment, Liberte made all of the premium payments sufficient to confer a benefit upon the Defendant. The Defendant does not dispute that this benefit was conferred by Liberte nor that the premiums were paid by Liberte or those entities under the

16

Receivership's control.   The payment of premiums on a void policy and retention of those

premiums by the insurer is contrary to the notions of fairness.  Allowing the insurer to retain these

payments undermines the public policy against wager contracts and denies the Plaintiff the right to

reclaim those premiums which were paid by Liberte for the benefit of their creditors.  *See e.g.*

*Diaz v. Florida Insurance Guaranty Association, Inc.*, 650 So.2d 675, 676 (Fla. 1995) (insurer

required to return premiums under void policy).

On this basis, the Plaintiff is entitled to the return of premiums under the theory of unjust

enrichment.

**CONCLUSION**

For the reason stated above, the Defendant's motion for summary judgment (Doc. No. 34)

is denied.  The Plaintiff's motion for summary judgment (Doc. No. 39) is granted.  The subject

policies, Policy Nos. 5865984; 58429531; and 58142993 are held to be void *ab initio*.  The

premiums previously paid are to be returned to the Receiver with interest for the benefit of the

Liberte creditors.

IT IS SO ORDERED.

S/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE

17
